## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ROGER CHIMNEY,<br>    *Plaintiff*,<br><br>      v.<br><br>ANGEL QUIROS *et al.*,<br>    *Defendants*. | No. 3:21-cv-00321 (JAM) |

## INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Plaintiff Roger Chimney is currently incarcerated by the Connecticut Department of

Correction ("DOC"). He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C.

§ 1983. He has also filed an amended complaint that simply provides additional allegations

related to events that occurred after he filed his complaint. Chimney primarily alleges claims of

deliberate indifference to serious medical needs. I will allow some of Chimney's claims to go

forward against some defendants, but I will dismiss others.

### BACKGROUND

Chimney names twenty defendants: DOC Commissioner Angel Quiros, Director Colleen

Gallagher, Deputy Warden Washington, Dr. Ricardo Ruiz, Dr. I. Feder, Medical Supervisor

Jones, APRN Sandra Charles, Medical Supervisor Jane Doe 2, RN Deborah Broadly, and Nurses

Jean Caplan, K. Collins, Jane Doe 1, Jane Doe 3, Amy, Kayla, Christine, Ann, Jane, Paul, and

Ame.[1] Defendants Washington, Dr. Ruiz, Collins, Doe 1, Doe 2, and Doe 3 work at Hartford

Correctional Center ("HCC"), defendants Dr. Feder, Amy, Kayla, and Christine work at

Corrigan-Radgowski Correctional Center ("Corrigan"), and defendants Jones, Caplan, Charles,

Broadly, Jane, Paul, and Ame work at Cheshire Correctional Institution ("Cheshire").[2] Chimney

---

[1] Doc. #1 at 1.
[2] *Id.* at 9-11.

is suing Commissioner Quiros, Deputy Warden Washington, Dr. Ruiz, Dr. Feder, and Director Gallagher in both their individual and official capacities, and is suing the remaining defendants solely in their individual capacity.[3] Chimney brings both federal claims and state law claims.[4]

Chimney was admitted to the DOC on November 20, 2019.[5] At the time Chimney filed his complaint, he was incarcerated at Cheshire.[6] Chimney has since moved to the Hartford Alternative in the Community ("AIC") program in Hartford, Connecticut.[7]

Chimney states that he has a number of "lingering medical issues," including obstructive sleep apnea, chronic back pain, asthma, obesity, arthritis, and flat feet, and that on the day of his arrest, he suffered from a fractured hand/wrist, a sprained knee, ulcers, chronic pain, and a helicobacter pylori ("H. pylori") infection.[8] Since his incarceration in November 2019, Chimney alleges that he has had a number of issues including painful toenail growth into his flesh; discomfort in his chest; blood in his stool, saliva, and, at times, urine; severe obesity, Type II diabetes, high blood pressure, and severe swelling in his legs and feet.[9]

During Chimney's intake with the nursing staff at HCC on November 20, 2019, Chimney informed the nurses that he had contracted H. pylori and suffered from a fractured hand, sprained knee, ulcers, severe pain, and a tubular adenoma of the colon and that he experienced many of

---

[3] Id. at 1.
[4] The Court limits its review for purposes of 28 U.S.C. § 1915A to Chimney's federal law claims. That is because one of the purposes of an initial review order is to make a speedy initial screening determination of whether the lawsuit may proceed at all in federal court and should be served upon any of the named defendants. If there are no facially plausible federal law claims against any of the named defendants, then the Court would likely decline to exercise supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367. On the other hand, if there are any viable federal law claims that remain, then the validity of any accompanying state law claims may be appropriately addressed in the usual course by way of a motion to dismiss or motion for summary judgment. See Hamlin v. City of Waterbury, et al., 2017 WL 4869116, at *1 n.1 (D. Conn. 2017).
[5] Doc. #1 at 12 (¶ 29).
[6] Id. at 12 (¶ 30).
[7] Doc. #9 at 1 (¶ 1).
[8] Doc. #1 at 12 (¶¶ 32-33).
[9] Id. at 12 (¶ 34).

the lingering issues mentioned above.[10] Chimney also told medical staff that his hand/wrist cast, knee brace, and medications were taken during booking and had not been returned.[11] The nurse told Chimney that his braces and medication had to be reviewed by the facility physician per protocol.[12] Doe 1 and Collins showed Chimney his cast and braces and had him sign releases to enable the medical unit to obtain treatment records from CVS Pharmacy and any hospitals that had treated him.[13] Doe 1 also gave Chimney two 400mg ibuprofen tablets for pain and told him that he would be seen by a doctor within a few days.[14] That same day, Chimney wrote a medical request "just to put staff on notice of his medical needs and the fact of him being seen soon."[15]

The next day, Chimney met with Collins, Doe 1, and Doe 2 about his medical issues.[16] Chimney alleges that they told him that his cast and knee brace did not comply with DOC protocol and that any hand or knee accessories would have to be ordered as there were none on hand large enough for him.[17] They also encouraged him to make bond as soon as possible.[18]

On November 23, 2019, Chimney experienced "overwhelming pain" and both wrote to the medical unit and spoke to block officers and passing medical staff about his pain, but received no help.[19] The next day, he wrote a medical request for medication.[20]

On November 28, 2019, Chimney was transferred from HCC to Cheshire without medication, a hand/wrist cast, or a knee brace.[21] During intake at Cheshire, Chimney again

---

[10] *Id.* at 13 (¶ 35).
[11] *Ibid.*
[12] *Id.* at 13 (¶ 36).
[13] *Id.* at 13 (¶ 37).
[14] *Id.* at 13 (¶ 38).
[15] *Id.* at 13 (¶ 39).
[16] *Id.* at 14 (¶ 40).
[17] *Ibid.*
[18] *Ibid.*
[19] *Id.* at 14 (¶ 41).
[20] *Id.* at 14 (¶ 42).
[21] *Id.* at 14 (¶ 43).

provided a list of his medical conditions and stated that he needed a cast, knee brace, and something to help him walk.[22] Nurse Jean had Chimney sign release papers so that the Cheshire medical unit could obtain his medical records and list of medications and told Chimney that he would be seen within a day or two.[23]

On November 30, 2019, Chimney submitted a request for pain medications for his hand, wrist, knee, and stomach.[24] However, no one answered his request.[25]

On December 4, 2019, Chimney told a correctional officer about experiencing pain and "not being able to do anything but rock back and forth on [his] bunk," "that it was hard to sleep," that he could not use his left hand, and that he could not walk without "feeling like falling."[26] Chimney told the correctional officer that he had sent multiple medical requests, but all went unanswered.[27] The correctional officer sent Chimney to the medical unit.[28] At the medical unit, Jane, Paul, and Broadly told Chimney that no hospitals or CVS pharmacies in Connecticut had medication or treatment records for him in the past five years.[29] These defendants told Chimney that he could receive disciplinary sanctions if he continued to seek medical treatment.[30] Chimney gave these defendants his home phone number and asked them to contact his family for his medical information.[31]

About a week later, Chimney noticed blood in his stool and began to vomit blood.[32] Chimney also felt weak from lack of sleep, was unable to hold a book in his fractured hand,

---

[22] *Ibid.*
[23] *Id.* at 14 (¶ 44).
[24] *Id.* at 15 (¶ 45).
[25] *Ibid.*
[26] *Id.* at 15 (¶ 46).
[27] *Ibid.*
[28] *Ibid.*
[29] *Id.* at 15 (¶ 47).
[30] *Ibid.*
[31] *Ibid.*
[32] *Id.* at 15 (¶ 48).

could not exercise, and found it too difficult to take a shower on some days.[33] Again, Chimney's attempts to be seen for medical treatment were unsuccessful.[34]

On December 16, 2019, Chimney spoke to Counselor Martinez about his medical problems.[35] The next day, Counselor Martinez told Chimney that Jones had been emailed and that Jones would see Chimney soon.[36] The day after that, Chimney was called to the medical unit, where he saw several of the defendants.[37] Jane told Chimney that on or before January 12, 2020, Chimney would be home and could go to his primary care doctor or the emergency room then and told him to rest in the meantime.[38] Jones then told Chimney not to file any more requests.[39] Chimney reported that he had bloody stools, severe pain, limited use of his left hand, and limited ability to stand to shower or use the toilet.[40] Chimney requested pain medications and help with other areas of pain he was experiencing.[41] Jane and Broadly took Chimney's vital signs and told Chimney to be "careful not to get in trouble for lying," while Paul gave Chimney a bag to recover blood samples.[42] Chimney was then sent back to his cell with no treatment.[43]

On December 20, 2019, Chimney had collected blood samples from his stool and vomit, but defendants refused to collect the samples and refused to give Chimney any treatment for his pain.[44] Jane, Ann, and Paul again emphasized that he would be discharged soon.[45] Chimney alleges that he wrote a grievance and several medical requests to the warden, but none were

---

[33] *Ibid.*
[34] *Ibid.*
[35] *Id.* at 16 (¶ 70).
[36] *Ibid.*
[37] *Id.* at 16 (¶ 50).
[38] *Ibid.*
[39] *Ibid.*
[40] *Ibid.*
[41] *Ibid.*
[42] *Id.* at 16 (¶ 51).
[43] *Id.* at 17 (¶ 52).
[44] *Id.* at 17 (¶ 53).
[45] *Ibid.*

answered.[46]

On January 7, 2020, Chimney was transferred back to HCC.[47] At medical intake, Doe 3 would not record Chimney's medical complaints and only told Chimney that he was on the doctor's list and would be seen soon, telling him, "We know you Chimney, you should leave in a day or two alright."[48] From around January 17, 2020 to April 3, 2020, Chimney received no medical help and no answers to his grievances or medical requests.[49]

On April 4, 2020, Chimney spoke to Deputy Warden Washington about his pain and lack of treatment.[50] When Washington asked Chimney if he was due to be discharged soon, Chimney responded that he needed treatment for pain now regardless of his date of discharge.[51] Washington told Chimney to write to the medical supervisors again.[52]

Chimney also asked the block officer to have him seen by the medical unit.[53] When Officer Dennis spoke to the medical unit, they asked if Chimney was complaining about pain and feeling weak.[54] Chimney told Officer Dennis that he needed immediate medical attention because he was in extreme pain, experienced dizziness when he stood up, had trouble getting around and using his left hand, and had severe stomach pain and discomfort.[55] When Officer Dennis relayed this information to the medical unit, they said that the unit was full and could not accept another patient but would call back if anything changed.[56] But no one called.[57] Chimney

---

[46] *Id.* at 17 (¶ 54).
[47] *Id.* at 17 (¶ 55).
[48] *Ibid.*
[49] *Id.* at 17 (¶¶ 56-57).
[50] *Id.* at 17 (¶ 58).
[51] *Ibid.*
[52] *Id.* at 18 (¶ 59).
[53] *Id.* at 19 (¶ 67).
[54] *Id.* at 19 (¶ 68).
[55] *Id.* at 19 (¶¶ 69-70).
[56] *Id.* at 19 (¶ 71).
[57] *Id.* at 20 (¶ 72).

submitted multiple requests to the medical department and medical supervisors daily for weeks following this incident.[58]

During third shift on April 4, 2020, Chimney was sleeping sitting up to avoid vomiting or choking as a result of his sleep apnea.[59] Lieutenant Randolph asked Chimney if he had been seen by the medical unit.[60] When Chimney said no and explained his medical issues, Lieutenant Randolph advised him to submit another request and a medical grievance.[61] Chimney gave a medical request to Lieutenant Randolph and put a medical grievance in the grievance box.[62] In both documents, Chimney described extreme pain.[63]

Chimney was called to the medical unit on April 30, 2020.[64] He met with Dr. Ruiz to review his medical grievance.[65] Dr. Ruiz stated that Chimney's medical and medication files had been received.[66] Dr. Ruiz ordered a sleep study to determine whether a CPAP machine or other appliance was needed.[67] Dr. Ruiz examined Chimney's feet and told Chimney he would receive assistance cutting his toenails shorter.[68] Dr. Ruiz told Chimney he would receive pain medication and be sent to outside physicians to treat his stomach pain, back pain, and ulcers.[69] Dr. Ruiz told Chimney to stop taking 325 mg Tylenol as that aggravated his condition.[70] Dr. Ruiz said Chimney would be provided a brace for his wrist/hand fracture and that x-rays and other examinations would be performed as part of his follow-up care.[71] Dr. Ruiz also stated that

---

[58] *Id.* at 20 (¶ 73).
[59] *Id.* at 20 (¶ 75).
[60] *Id.* at 20 (¶ 77).
[61] *Id.* at 20 (¶¶ 78-79).
[62] *Id.* at 20 (¶ 80).
[63] *Ibid.*
[64] *Id.* at 21 (¶ 81).
[65] *Id.* at 21 (¶ 82).
[66] *Id.* at 21 (¶ 84).
[67] *Id.* at 21 (¶ 85).
[68] *Id.* at 21 (¶ 86).
[69] *Id.* at 21 (¶¶ 87-88).
[70] *Id.* at 21 (¶ 89).
[71] *Id.* at 21 (¶ 90).

Chimney would get footwear to address the conditions with his feet.[72] Chimney would receive immediate treatment for pain, *H. pylori*, and related chest infections, but outside doctors would need to run tests to rule out a tumor or cancer.[73] Dr. Ruiz inquired about Chimney's discharge date, stating that, because he was the only doctor, Chimney could receive better treatment for his serious conditions outside of prison.[74]

After receiving treatment for *H. pylori*, Chimney's condition remained unchanged.[75] Chimney was prescribed 325 mg Tylenol tablets even though Dr. Ruiz had said that this worsened his condition.[76] He did not receive a brace for his hand/wrist.[77] When he asked for assistance cutting his toenails, the medical supervisor, Collins, and Doe 3 laughed at him and said it was not their job.[78] No treatment was provided in response to Chimney's many requests, and one unspecified defendant told him to "make bond, stay out, get the help you need, please no more request[s] Mr. Chimney, we all know you know."[79] The medical supervisor told Chimney that she had "hundreds of inmates, and it's hard to stay afloat, make bond Mr. Chimney, do us all a favor."[80]

Chimney was next transferred to Corrigan.[81] At intake, Christine told Chimney to submit a list of his medical issues on request forms and they would get to him.[82] After submitting several requests, Chimney saw Amy, who told him he was on the doctor's list but advised him to

---

[72] *Id.* at 22 (¶ 91).
[73] *Id.* at 22 (¶ 92).
[74] *Id.* at 22 (¶¶ 93-94).
[75] *Id.* at 22 (¶ 95).
[76] *Id.* at 22 (¶ 96).
[77] *Id.* at 22 (¶ 97).
[78] *Id.* at 22 (¶ 98).
[79] *Id.* at 22-23 (¶¶ 99-100).
[80] *Id.* at 23 (¶ 101).
[81] *Id.* at 23 (¶ 102).
[82] *Id.* at 23 (¶ 103).

make bond if possible because the medical unit was dealing only with the coronavirus.[83]

Chimney's condition worsened.[84] He spoke to Dr. Feder about discomfort in his chest, but Dr. Feder called him a "complainer" and "a pain himself" and walked away.[85] After submitting numerous requests and two grievances, Chimney was prescribed insulin and blood pressure medication.[86] This treatment was provided three months after his diabetes and high blood pressure had been diagnosed.[87]

Chimney was at some point transferred back to Cheshire.[88] At intake, Jane asked Chimney to list all his complications but interrupted him by "sarcastically saying yea yea yea," and telling him that she had to get him to his cell and give him his insulin.[89] Chimney did not get his insulin or blood pressure medication for four days after being placed in a cell.[90]

After he submitted several requests and two grievances, Chimney was called out of his cell by Paul and Mike.[91] Chimney described pain in his hand, wrist, stomach, and feet; swollen legs and feet; a need for a CPAP machine or other appliance to treat obstructive sleep apnea; and back pain.[92]

On December 9, 2020, Thomas Walker, Chimney's cellmate, told Counselor Molina that he was unable to sleep because of the noises Chimney made when sleeping.[93] Walker stated that, if he was not moved, there would be violence between himself and Chimney.[94] Chimney states

---

[83] *Id.* at 23 (¶ 105).
[84] *Id.* at 24 (¶ 107).
[85] *Id.* at 24 (¶ 108).
[86] *Id.* at 24 (¶ 109).
[87] *Ibid.*
[88] *Id.* at 24 (¶ 110).
[89] *Id.* at 25 (¶ 111).
[90] *Id.* at 25 (¶ 112).
[91] *Id.* at 25 (¶ 113).
[92] *Id.* at 25 (¶ 114).
[93] *Id.* at 26 (¶ 116).
[94] *Ibid.*

in his introduction to the complaint that Charles told him "it will all be all over soon" as his end-of-sentence date was near.[95] Chimney alleges that he wraps t-shirts and towels around his wrist to ease the pain; walks with a limp or not at all because of pain in his legs, back and stomach; sleeps sitting up to avoid choking, snoring, and heavy breathing; has bloody stool, and experiences anxiety because of his conditions.[96]

On January 14, 17, and 24, 2021, Chimney submitted requests for treatment of severe pain.[97] He has not received any answers or medical treatment.[98]

Although Chimney was told in October 2020 that he required diabetic footwear, he has not received them.[99] Chimney eats to suppress pain and anxiety.[100] His weight has increased from 340 lbs. at admission to 597.7 lbs.[101] Chimney's hand healed without a cast or therapy and his sprained knee healed without a brace or therapy.[102] Chimney also mentioned that he wrote to Dr. Feder about his pain, but Dr. Feder did not reply or provide treatment.[103]

Chimney claims that DOC medical officials are "bold within their denial of medical care," alleging that Paul and Mike have told him "someone told us to see you one time."[104] Chimney also alleges that he was transferred four times in ten months as a form of retaliation.[105] Chimney states that "ALL defendants have called plaintiff a liar and did threat[en] him with [disciplinary] action if plaintiff would not stop relaying to people he was not getting proper medical care," and that all defendants treated him as "if he didn't have enough time to be in

---

[95] *Id.* at 7.
[96] *Id.* at 26 (¶ 117).
[97] *Id.* at 27 (¶¶ 119-21).
[98] *Id.* at 27 (¶¶ 122-23).
[99] *Id.* at 28 (¶ 129).
[100] *Id.* at 28 (¶ 132).
[101] *Id.* at 28 (¶ 131).
[102] *Id.* at 28 (¶ 133).
[103] *Id.* at 28 (¶ 130).
[104] *Id.* at 29 (¶ 135).
[105] *Id.* at 29 (¶ 136).

prison to receive the adequate medical care needed to treat [his] serious medical needs."[106]

On February 3, 2021, Chimney was transferred to Osborn Correctional Institution ("Osborn").[107] Amy told him that he was too close to the end of his sentence to receive the medical treatment he needed.[108] She said she would try to get his pain medication reinstated because "Cheshire medical officials only looked to minister pain meds to plaintiff for one period of a month and no more."[109] She advised him to submit medical request for all of his issues and they would get to them as soon as possible but stated that he probably did not have enough time left to get an appliance to treat his sleep apnea.[110]

At sick call on February 13, 2021, a nurse advised Chimney to schedule examinations with a cardiologist, endocrinologist, orthopedist, and podiatrist upon his release because there was not enough time remaining on his sentence to get a referral through the DOC.[111]

In his amended complaint, Chimney adds that he has been classified as a Type II diabetic and that he requires insulin twice daily, along with other medications.[112] On March 26, 2021, Officer S. Williams "called out plaintiff to carry out discharge plain and simple," so that Chimney would know "where he was going," "his foregoing responsibilities," and his "medical responsibility and medicine."[113] Williams also told Chimney that he would be taught how to give himself diabetic shots.[114] Chimney alleges that Williams advised Osborn medical staff to provide Chimney with a medical session or class showing him to read "measurements on medical bottles," "how to clean, use, and dispose of needles before and after injections," where and how

---

[106] *Id.* at 29 (¶¶ 138-39).
[107] *Id.* at 30 (¶ 146).
[108] *Ibid.*
[109] *Id.* at 31 (¶ 147).
[110] *Id.* at 31 (¶¶ 148-49).
[111] *Id.* at 31.
[112] Doc. #9 at 1 (¶ 2).
[113] *Id.* at 3 (¶¶ 8-9).
[114] *Id.* at 3 (¶ 10).

to inject medicine, how to store medicine, and "when and when not to take insulin."[115] However, Osborn medical staff did not comply with Williams's instructions.[116]

On March 29, 2021, medical staff took Chimney's vital signs, temperature, and blood pressure.[117] Chimney alleges that when he asked about learning how to use needles for his diabetes treatment, the nurse told him that another nurse would be going over it with him.[118]

On March 30, 2021, Chimney was taken to the Osborn medical unit to receive his morning insulin shot before being discharged, and when Chimney asked the nurse about giving himself shots, the nurse told him that the "transfer was waiting" and that he should check in with medical at his next destination.[119] Chimney was then transferred to the AIC program in Hartford, Connecticut.[120]

Chimney includes sixteen counts: (1) First Amendment Protected Speech: defendants Doe 2, Collins, Dr. Feder, Jones, Charles, and Broadly denied plaintiff medical treatment after learning that he had been writing for medical care; (2) Failure to Inquire into Essential Facts: defendants Doe 2, Broadly, and Jones knew that plaintiff has preexisting conditions yet denied him pain medication and antibiotics; (3) Eighth Amendment: defendants Jones, Broadly, Caplan, Amy Jane, Paul, Collins, Doe 1, Doe 2, Doe 3, Dr. Feder, Ann, Kayla, Christine, Dr. Ruiz, Deputy Warden Washington, and Gallagher denied him adequate medical care because he was soon to be released and they did not take his complaints seriously; (4) Failure to Act: all defendants failed to provide medical treatment; (5) Failure to Supervise: defendants Deputy Warden Washington, Quiros, Gallagher, Ruiz, Feder, Jones, Charles, Broadly, and Doe 2 knew

---

[115] *Id.* at 2 (¶¶ 4-5).
[116] *Ibid.*
[117] *Id.* at 4 (¶ 11).
[118] *Id.* at 4 (¶¶ 12-13).
[119] *Id.* at 4 (¶¶ 14-15).
[120] *Id.* at 5 (¶ 16).

of the harm plaintiff faced but failed to supervise their subordinates; (6) Policy and Custom A.D. 8.4: defendants Quiros and Gallagher failed to establish set wait times to be seen; (7) Delay of Access to Medical Care: defendants required plaintiff to wait over six months for medical care; (8) Denial of Serious Medical Needs: defendants Caplan, Broadly, Jones, Doe 2, Collins, Feder, Kayla, Christine, Charles, Paul, and Jane refused to treat plaintiff despite knowing his medical conditions from requests, grievances, and medical records; (9) Negligence/Medical Malpractice: defendants failed to prescribe necessary medication, prescribed inappropriate medication, delayed examinations and treatment, and failed to perform diagnostic tests; (10) Negligence/Medical Malpractice: defendants failed to treat plaintiff because he was near his release date; (11) defendants delayed needed medical care; (12) deliberate indifference to medical needs in violation of the Eighth Amendment; (13) deliberate indifference to medical needs in violation of the Eighth Amendment regarding failure to provide follow-up examinations and treatment for plaintiff's fractured bone, injured knee, back pain, ulcers, and chest pain and failure to provide physical therapy for his hand, wrist, and knee; (14) negligence for failure to provide follow-up treatment for plaintiff's fractured bone, injured knee, hand and wrist, obstructive sleep apnea, ulcers, *H. pylori*, irregular releasing of blood, chronic pain, back pain, arthritis, and ingrown toenails; (15) Eighth Amendment: defendants Jones, Charles, Broadly, Caplan, Feder, Ruiz, and Doe 2 intentionally delayed care; (16) Delay in Treatment: defendants Ruiz, Feder, Jones, Charles, Broadly, and Doe 2 disregarded his complaints regarding his knee, hand/wrist, and back and diagnosed but provided no treatment for obstructive sleep apnea, arthritis, asthma, *H. pylori*, severe obesity, flat feet, blood clots, slipped disc, and nerve disorders.

Many of these counts are iterations of the same deliberate indifference to serious medical

needs claims. The Court considers the federal claims by substance, rather than count, considering claims for deliberate indifference to medical needs, failure to supervise, retaliation, and failure to comply with prison directives. Chimney seeks injunctive and declaratory relief and compensatory damages.[121]

DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

The Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### Deliberate indifference

The Eighth Amendment to the U.S. Constitution protects sentenced prisoners against the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. It is unclear if Chimney was sentenced at the time of the events at issue. If not, then he was subject to protection as a pretrial detainee under the due process clause of the Fourteenth Amendment. *See Darnell v.*

---

[121] *Id.* at 55-64.

14

*Pineiro*, 849 F.3d 17, 30-36 (2d Cir. 2017) (discussing distinction between deliberate indifference claim arising under the Fourteenth Amendment's due process clause for a pretrial detainee and a deliberate indifference claim under the Eighth Amendment for a sentenced prisoner).

I will err on the side of caution and consider his claims under the due process clause of the Fourteenth Amendment. To allege a claim for deliberate indifference to serious medical needs as a pretrial detainee, a plaintiff must show that: (1) his conditions of confinement *objectively* "pose an unreasonable risk of serious damage to his health," and (2) the official *subjectively* "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 30, 35; *see also Charles v. Orange Cty.*, 925 F.3d 73, 86-87 (2d Cir. 2019) (applying same two-part objective/subjective standard to detainee's claim for deliberate indifference to serious medical needs under the Fourteenth Amendment).

Chimney alleges that he suffers from a range of medical conditions—including a fractured hand and wrist, sleep apnea, obesity, and diabetes—all of which were untreated. For the purposes of initial review, I will assume that Chimney has serious medical needs sufficient to satisfy the objective prong for a deliberate indifference claim.

Chimney makes a series of allegations against various defendants at different correctional facilities and I will address the allegations against defendants at each facility in turn, beginning with Chimney's time at HCC. When Chimney was first admitted to HCC, he told Doe 1, Collins, and Doe 2 about his medical issues, while they told him that his hand/wrist cast and knee brace did not comply with DOC protocol and that new ones would have to be ordered to accommodate

his size.[122] Doe 1 gave Chimney two ibuprofen tablets, but Chimney was transferred to Cheshire within about eight days, before he was seen or any other medical treatment was provided.[123]

When Chimney came back to HCC on January 7, 2020, Doe 3 refused to record his medical complaints, telling him that he was on the doctor's list and, "We know you Chimney, you should leave in a day or two alright."[124] Chimney received no medical help and no answers to his grievances or medical requests until he was seen by Dr. Ruiz on April 30, 2020.[125] Although Dr. Ruiz promised a sleep study, assistance with his toenails, pain medication, treatment for his hand/wrist, footwear to address diabetes-related issues, and immediate treatment for chest infections, pain, and *H. pylori*, the only treatment Chimney received was for *H. pylori*.[126] Rather than providing treatment, Chimney alleges that the HCC defendants repeatedly told him to make bond, to file another request, or that he was too close to his release date for treatment. Chimney specifically alleges that when he told Washington about his pain and lack of treatment, Washington told him to write to the medical supervisors again.[127] Chimney also alleges that when he asked for assistance cutting his toenails, the medical supervisor (presumably Doe 2), Collins, and Doe 3 laughed at him and said it was not their job.[128] Chimney also states that the HCC medical supervisor (again, presumably Doe 2), told him that she had "hundreds of inmates, and it's hard to stay afloat, make bond Mr. Chimney, do us all a favor."[129] Chimney otherwise only refers obliquely to the medical unit, but does not specify the personal involvement of specific defendants in failing to respond to his requests or to treat him.

---

[122] Doc. #1 at 13-14 (¶¶ 35-40).
[123] *Id.* at 13-14 (¶¶ 38, 41-42).
[124] *Id.* at 17 (¶ 55).
[125] *Id.* at 17 (¶¶ 56-57).
[126] *Id.* at 20-22 (¶¶ 75-95).
[127] *Id.* at 17-18 (¶¶ 58-59).
[128] *Id.* at 22 (¶ 98).
[129] *Id.* at 23 (¶ 101).

The only specific allegations Chimney makes against specific HCC defendants—versus conclusory allegations against "defendants" or the medical staff as a whole—do not rise above the level of medical malpractice. While certain defendants may have been dismissive or rude to Chimney, Chimney has not alleged specific facts to establish that any one specific defendant recklessly failed to act with reasonable care. Accordingly, I will dismiss the Fourteenth Amendment deliberate indifference claims against defendants Dr. Ruiz, Collins, Deputy Warden Washington, and Does 1, 2, and 3.

Chimney also makes allegations against a number of defendants at Cheshire. Chimney was first transferred to Cheshire on November 28, 2019, where he provided a list of his medical conditions and stated that he needed a hand/wrist cast, a knee brace, and something to help him walk.[130] Two days after intake, Chimney asked for pain medications, but his request went unanswered.[131] On December 4, 2019, after a correctional officer sent Chimney to the medical unit, Jane, Paul, and Broadly told Chimney that there were no outside medical records for him and threatened him with disciplinary sanctions if he continued to seek medical care.[132] Later that month, after Chimney reported vomiting blood and bloody stool, Jane said he was scheduled for release on January 12, 2020 and no treatment was provided.[133] Jane and Broadly took Chimney's vital signs and told Chimney to be "careful not to get in trouble for lying."[134] And when Chimney collected blood samples, defendants refused to collect the blood samples and denied him treatment, with Jane, Ann, and Paul instead emphasizing that he would be discharged soon.[135]

---

[130] *Id.* at 14 (¶ 43).
[131] *Id.* at 15 (¶ 45).
[132] *Id.* at 15 (¶¶ 46-47).
[133] *Id.* at 16-17 (¶¶ 50, 52).
[134] *Id.* at 16 (¶ 51).
[135] *Id.* at 17 (¶ 53).

Chimney's allegations that Jane, Ann, Paul, Broadly, and Jones all refused him treatment at different points and that Jane, Paul, and Broadly threatened him with disciplinary sanctions for seeking treatment are sufficient to allege a Fourteenth Amendment deliberate indifference claim. While Chimney alleges that Caplan and Charles also worked at Cheshire, he makes no specific allegations against them regarding his first, pretrial confinement at Cheshire. Accordingly, this claim will go forward against Jane, Ann, Paul, Broadly, and Jones, but I will dismiss it as to Caplan and Charles.

Chimney also makes allegations against a number of defendants at Corrigan. Chimney alleges that on intake, Christine told him to submit a list of his medical issues on request forms and that after submitting several requests, he saw Amy, who told him he was on the doctor's list but advised him to make bond if possible because the medical unit was dealing only with the coronavirus.[136] Neither of these allegations shows that Christine or Amy acted intentionally to deny him medical care or recklessly failed to act. Chimney also fails to make any specific claims against Kayla. Accordingly, I will dismiss the Fourteenth Amendment deliberate indifference claims against Christine, Amy, and Kayla.

Chimney also alleges that when he saw Dr. Feder and told Dr. Feder about discomfort in his chest and his worsening condition, Dr. Feder called him a "complainer" and "a pain himself" and walked away.[137] This allegation is arguably sufficient to show that Dr. Feder was aware of a serious risk to Chimney and recklessly disregarded it. Accordingly, I will allow the Fourteenth Amendment deliberate indifference claim to go forward against Dr. Feder.

Finally, in relation to his time at Corrigan, Chimney alleges that despite being diagnosed with diabetes and high blood pressure, he was not prescribed insulin and blood pressure

---

[136] *Id.* at 23 (¶¶ 103, 105).
[137] *Id.* at 24 (¶ 108).

medication until three months later, and only after he submitted multiple requests and two grievances.[138] Again, however, Chimney does not specify which defendant personally failed to treat him or denied him medical care. Accordingly, this Fourteenth Amendment deliberate indifference claim is dismissed.

Chimney alleges that upon the second intake at Cheshire, Jane asked him to list all of his medical conditions but interrupted him and told him she needed to "get you to your cell and get you your insulin."[139] Chimney also alleges that he did not get his insulin or blood pressure medication for four days after being placed in a cell.[140] The Second Circuit has instructed that "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis in original). But "[c]ourts have held that denial of a single dose, or even several doses, of a needed medication is insufficient, without more, to establish a serious delay in treatment under the Eighth Amendment." *Schlosser v. Carter*, 2021 WL 1124280, at *9 (D. Conn. 2021) (collecting cases); *Constantino v. DiStefano*, 2020 WL 353094, at *5 (E.D.N.Y. 2020) (collecting cases). Although the Fourteenth Amendment standard is slightly broader than the Eighth Amendment standard, I conclude that without an allegation that Chimney suffered harm or that he faced an excessive risk of harm from the four-day delay, Chimney has failed to state a plausible deliberate indifference claim. Accordingly, I will dismiss this claim against

---

[138] *Id.* at 24 (¶ 109).
[139] *Id.* at 25 (¶ 111).
[140] *Id.* at 25 (¶ 112).

Jane.

Chimney also later explained a number of his issues to Paul, though Chimney does not describe what Paul did in response.[141] In December 2020, after Chimney's cellmate threatened him with violence if the cellmate was not moved to another cell, Charles told Chimney "it will all be over soon" as his end-of-sentence date was near.[142] In January 2021, Chimney submitted at least three requests for treatment of his pain but received neither answers nor treatment.[143]

Chimney alleges that during his second time at Cheshire, he had been forced to wrap T-shirts and towels around his wrist to ease the pain, indicating that he had not been provided with the proper care for his wrist, but does not allege the personal involvement of any specific defendant in this lack of care.[144] Chimney also alleges that he has not been provided with the proper diabetic footwear despite being told that he needed it, though again he does not specify a particular defendant.[145] Chimney also conclusorily mentions that he wrote to Dr. Feder about his pain, but Dr. Feder did not reply or provide treatment.[146] These allegations are not enough to establish that any particular defendant was deliberately indifferent to Chimney's serious medical needs during his second time at Cheshire.

Chimney also makes a number of allegations in his complaint and in his amended complaint about his time at Osborn. Chimney was transferred to Osborn on February 3, 2021, about a week before he signed his complaint on February 8, 2021.[147] Chimney was then transferred from Osborn to the AIC Program in Hartford on March 30, 2021.[148] While there may

---

[141] *Id.* at 25 (¶¶ 113-14).
[142] *Id.* at 7.
[143] *Id.* at 27 (¶¶ 122-23).
[144] *Id.* at 26 (¶ 117).
[145] *Id.* at 28 (¶ 129).
[146] *Id.* at 28 (¶ 130).
[147] *Id.* at 30 (¶ 146); *see also id.* at 64.
[148] Doc. #9 at 4 (¶ 14).

be a question of whether Chimney was even able to fully exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1995, I need not inquire into the question of exhaustion as Chimney's allegations regarding Osborn are insufficient to state a deliberate indifference claim.

Chimney alleges that at Osborn, Ame told him on intake that he was too close to the end of his sentence to receive the medical treatment he needs, but that she said she would try to get his pain medication reinstated and advised him to submit medical requests for all of his issues.[149] Chimney also alleges that a correctional officer told Osborn medical staff to teach Chimney how to manage his diabetes injections but that Osborn medical staff did not listen to the correctional officer.[150] Chimney further alleges that an unspecified nurse told him that another nurse would show him how to use needles for his diabetes, and that later, when Chimney asked another nurse about it again, the nurse told him that the "transfer was waiting" and that he should check in with medical at his next destination.[151]

None of these allegations rises above the level of medical malpractice. Accordingly, I will dismiss Chimney's Fourteenth Amendment deliberate indifference claims related to his time at Osborn.

### Supervisory liability

Chimney alleges that Washington, Quiros, Gallagher, Dr. Ruiz, Dr. Feder, Jones, Charles, Broadly, and Doe 2 knew of the harm Chimney faced but failed to supervise their subordinates. Chimney also makes broad, often conclusory allegations against multiple, unspecified defendants and alleges a failure to supervise on the part of other defendants. The Second Circuit has recently

---

[149] Doc. #1 at 30-31 (¶¶ 146-49).
[150] Doc. #9 at 2 (¶¶ 4-5).
[151] *Id.* at 4 (¶¶ 11-15).

clarified the standard for supervisory liability and ruled that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Thus, for deliberate indifference claims, "the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." *Id.* at 616. Chimney must therefore establish that each defendant acted with deliberate indifference, that is, that each defendant "personally knew of and disregarded an excessive risk to [Chimney]'s health or safety." *Id.* at 619.

As for Quiros and Gallagher, Chimney has made no specific allegations against either defendant—except the nature of their positions within the DOC—to show that the defendant had knowledge of and disregarded an excessive risk to Chimney's health or safety. Accordingly, I will dismiss the claims against Quiros and Gallagher. And while Chimney alleges that he told Washington about his condition, and that Washington directed Chimney to file medical requests, Chimney has alleged no facts to show that Washington personally disregarded an excessive risk to Chimney's health or safety. Indeed, by Chimney's own allegations, Washington did not disregard Chimney's concerns but instead told him to file a medical request. Accordingly, I will also dismiss the claims against Washington.

As for Dr. Ruiz, Dr. Feder, Jones, Charles, Broadly, and Doe 2, Chimney has sufficiently alleged that each defendant at least knew of Chimney's medical issues. But I have already found that Chimney has only alleged plausible Fourteenth Amendment deliberate indifference claims against Dr. Feder, Jones, and Broadly. Chimney has not alleged in a nonconclusory fashion how Dr. Ruiz, Charles, and Doe 2 were personally involved in his deliberate indifference claim. Accordingly, I will allow Chimney's claims to go forward against Dr. Feder, Jones, and Broadly,

22

but I will dismiss them as to Dr. Ruiz, Charles, and Doe 2.

### *First Amendment*

Chimney asserts two possible First Amendment retaliation claims. In Count One, he alleges that Doe 2, Collins, Dr. Feder, Jones, Charles, and Broadly denied him medical treatment after they learned he had been submitting requests for medical care. In the section of the complaint entitled "Legal Claims," before listing his separate counts, Chimney also states that he was transferred among correctional facilities for submitting requests and grievances seeking medical care, though he does not attribute these transfers to any specific defendant.[152]

"Prison officials may not retaliate against inmates for exercising their constitutional rights." *Perez v. Cook*, 2020 WL 3893024, at *5 (D. Conn. 2020). "To establish a First Amendment retaliation claim, [Chimney] must show (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against [him], and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019). The adverse action must have been serious enough to "deter a similarly situated individual of ordinary firmness from exercising his constitutional rights." *Fabricio v. Annucci*, 790 F. App'x 308, 311 (2d Cir. 2019).

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015). For this reason, a prisoner's First Amendment retaliation claim must "be supported by specific and detailed factual allegations, not stated in wholly conclusory

---

[152] Doc. #1 at 41 (¶ 191).

terms." *Ibid.*

Chimney alleges that certain defendants retaliated against him for filing grievances and medical requests. A prisoner has a right under the First Amendment to complain about prison conditions, especially conditions that the prisoner believes endanger his health and safety. "The filing of grievances clearly constitutes protected activity." *Dehaney v. Chagnon*, 2017 WL 2661624, at *3 (D. Conn. 2017). Chimney clearly engaged in protected activity and satisfies the first prong.

Chimney alleges two forms of adverse action: 1) denial of medical treatment, and 2) unwarranted transfers between correctional facilities. Denial of medical treatment may be a form of adverse action, as it would "suffice to deter a similarly situated individual of ordinary firmness from filing a constitutionally protected grievance against a prison doctor." *Thurmond v. Thomas-Walsh*, 2019 WL 1429559, at *10 (S.D.N.Y. 2019) (collecting cases). I find that for the purposes of initial review Chimney's allegations that defendants denied him medical treatment in retaliation constitute adverse action. Further, Chimney alleges that the denial of medical treatment was directly connected to his request for treatment. Accordingly, I will allow the First Amendment retaliation claim against defendants Doe 2, Collins, Dr. Feder, Jones, Charles, and Broadly to proceed.

Chimney's second retaliation allegation concerns repeated transfers between correctional facilities. While temporal proximity between protected activity and an adverse action may be circumstantial evidence of retaliation, the Second Circuit has "consistently required some further evidence of retaliatory animus before permitting a prisoner to proceed to trial on a retaliation claim." *Washington v. Afify*, 681 F. App'x 43, 45-46 (2d Cir. 2017). Although Chimney alleges that he frequently filed medical requests and grievances, he was only transferred periodically.

Chimney also does not allege any facts to suggest that defendants—mainly made up of medical staff—were personally involved in the decisions to transfer him. Further, it is not clear on the basis of Chimney's complaint that the transfers were motivated by his request for medical treatment rather than events in his criminal case. Chimney's only allegations are conclusory in nature. Accordingly, I will dismiss his First Amendment retaliation claim for transfers between correctional facilities.

### *Failure to comply with directives*

Chimney contends that Quiros and Gallagher failed to comply with certain administrative directives. But this claim lacks merit because "[i]nmates have no constitutional entitlement to grievance procedures, to receive a response to a grievance, or to have a grievance processed properly." *Schlosser v. Manuel*, 2020 WL 127700, at *5 (D. Conn. 2020). Moreover, state prison directives "do not confer any constitutionally protected rights on inmates." *Riddick v. Chevalier*, 2013 WL 4823153, at *4 (D. Conn. 2013) (citing *Sandin v. Conner*, 515 U.S. 472, 481-82 (1995)). Accordingly, I will dismiss this claim.

### CONCLUSION

For the foregoing reasons, the Court enters the following orders:

(1) The following claims shall proceed against the following defendants: Chimney's Fourteenth Amendment deliberate indifference claims against defendants Dr. Feder, Jane, Ann, Paul, Broadly, and Jones and Chimney's First Amendment retaliation claim against defendants Doe 2, Collins, Dr. Feder, Jones, Charles, and Broadly. All remaining claims and defendants are DISMISSED.

(2) If the plaintiff believes there are additional facts the plaintiff can allege that will overcome any of the deficiencies identified in this ruling, then the plaintiff may file a proposed

amended complaint within 30 days of this order.

(3) The Clerk shall verify the current work addresses for the named defendants with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to those defendants at the confirmed addresses within twenty-one (21) days of this Order, and report to the Court on the status of the waiver requests by not later than the thirty-fifth (35) day after mailing. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(4) The Clerk shall prepare a summons form and send an official capacity service packet to the U.S. Marshal Service. The U.S. Marshal is directed to effect service of the Complaint on defendant Dr. Feder at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, within twenty-one (21) days from the date of this Order and to file a return of service within thirty (30) days from the date of this Order.

(5) All defendants shall file their response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

(6) The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(7) The discovery deadline is extended to six months (180 days) from the date of this Order. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this order. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over

26

discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

(8) The deadline for summary judgment motions is extended to seven months (210 days) from the date of this Order.

(9) Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion (i.e. a motion to dismiss or a motion for summary judgment) within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

(10) If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)(2) provides that he MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he must indicate all of the case numbers in the notification of change of address. Plaintiff must also notify defendants or defense counsel of his new address.

It is so ordered.

Dated at New Haven this 12th day of November 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge